JOHN CLAY, JR., *et al.*, v. JAMES G. WOODRUM *et al.*

1. CONTRACT — *Action by Third Party — Equities — Failure of Considera-tion, Good Defense.* In a contract between two parties involving mutual agreements and for the sale of property, in which the first party made a promise to the second for the benefit of a third person, such third person may maintain an action against the first on the promise; but if he avails himself of the contract and claims under its provisions, he will be affected by the equities growing out of the contract between the first and second parties; and a failure of consideration will be a good defense in an action by the third party upon such contract.

2. ———— *Set-off.* In such an action, where a personal judgment is sought against the first party, and where the third party is indebted to the first, such indebtedness is a proper subject of set-off, and the two demands must be deemed compensated, so far as they equal each other.

*Error from Washington District Court.*

JAMES G. WOODRUM brought this action in the district court of Washington county against *Clay, Robinson & Co.*, George S. Elwood, and the Washington National Bank. He alleged in his petition that in 1887 he was the owner of 360 head of two- and three-year-old steers, kept by him in Washington county, and which were in perfect health until July 1, 1887; that on or about April 2d, George S. Elwood drove into the county of Washington a large number of cattle which were capable of communicating and liable to impart Texas, splenic, or Spanish fever; that George S. Elwood drove these cattle through the highways and uninclosed pastures, knowing that the cattle were from the prohibited district south of Kansas, and liable to communicate fever to others; that Woodrum's cattle contracted the fever, and that 167 of them sickened and died; that 93 of these were yearlings, 63 two-year-olds, and 10 three-year-olds; that the yearlings which died were worth $19 per head — in all the sum of $1,767; that the two-year-olds were worth $27 per head — in all the sum of $1,701; that the three-year-olds were worth $32 per

head — in all the sum of $320, and that the surviving portion of the herd — 194 head — were damaged in the sum of $970; that the plaintiff was compelled to expend money for medicines and extra labor in taking care of the cattle, in the sum of $200. He alleged that the total damages sustained, by reason of this disease being imparted to his cattle, was $4,958. He then alleged, in substance, that on September 10, 1887, Clay, Robinson & Co. entered into a written contract with George S. Elwood, by which Elwood sold to them the herd of cattle which communicated the fever, together with a large amount of other property, for certain considerations, and by the terms of the contract Clay, Robinson & Co. assumed and agreed to pay Woodrum all damages sustained by reason of his cattle dying or being injured from having contracted the fever. The following is a copy of the contract:

"Article of agreement between Geo. S. Elwood, of Washington county, Kansas, and Clay, Robinson & Co., of Chicago, Illinois, witnesseth —

"That said Geo. S. Elwood hereby agrees to sell and does sell to Clay, Robinson & Co. the following property, viz.: 560 head of cattle, more or less, being all the cattle on Rock Hill ranch belonging to said Elwood, or Elwood & Morehead; also all the cattle, being 260 head, more or less, now on Tootle's pasture near Greenleaf; also 500 head of cattle in the Indian Territory, in the vicinity of Arkansas City, in the McCormick, Brown & Co. pasture, said three bunches of cattle to aggregate 1,320 head; also 2,200 head of sheep and lambs, to be delivered within twenty days from September 12, 1887, on section 23, in Logan township, in Washington county; also 100 head of horses, to be delivered on section 19, township 4, range 4, Washington county, Kansas, said horses to be of the following description: 1 Clydesdale stallion; 1 sorrel stallion; between 50 and 60 brood mares; 1 pair of broken work mares; 20 colts, part Clyde, balance yearlings and two-year-olds, said horses having been kept on said section heretofore. Also said Elwood agrees to convey this September 10, 1887, or September 12, 1887, or cause to be conveyed to said Clay, Robinson & Co., the following real estate, viz.: W. $\frac{1}{2}$ and N. $\frac{1}{2}$ of N. E. $\frac{1}{4}$, and S. W. $\frac{1}{4}$ of N. E. $\frac{1}{4}$, and N. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$ section 19, township 4, range 4, 480 acres, now

mortgaged for $5,000; E. $\frac{1}{2}$ section 32, township 1, range 2, 320 acres; N. W. $\frac{1}{4}$ of S. W. $\frac{1}{4}$ section 28, township 1, range 2, 40 acres; N. $\frac{1}{2}$ of S. E. $\frac{1}{4}$ section 29, township 1, range 2, 80 acres; S. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$ section 29, township 1, range 2, 40 acres; W. $\frac{1}{2}$ and N. E. $\frac{1}{4}$ section 23, township 3, range 4, 480 acres, this last 480 mortgaged for $3,700 and interest; S. E. $\frac{1}{4}$ section 28, township 3, range 4 (to be deeded by September 17, 1887), 160 acres, mortgaged for $2,300 and interest; S. $\frac{1}{2}$ N. E. $\frac{1}{4}$ and N. $\frac{1}{2}$ S. E. $\frac{1}{4}$ section 23, township 4, range 4, 160 acres, mortgaged for $2,000 and interest; N. E. $\frac{1}{4}$ section 10, township 5, range 4, 160 acres, mortgaged for $2,000 and interest; N. $\frac{1}{2}$ section 5, township 5, range 4, 320 acres, mortgaged for $4,700; 11 lots and one acre tract in the city of Greenleaf, mortgaged for $1,500; north half of two lots on corner of Commercial street, in Lavan's addition to Greenleaf, mortgaged for $1,000—immediate possession of all said real estate to be given Clay, Robinson & Co.; none of said mortgages or any incumbrances are to be assumed by said Clay, Robinson & Co. Also said Elwood hereby sells and conveys to said Clay, Robinson & Co. all the feed belonging to him on the above-described land. Also said Elwood agrees to turn said cattle over to said Clay, Robinson & Co. at once, and said Elwood further agrees to pay all claims against said cattle for losses by reason of Texas, splenic or Spanish fever having been communicated by said cattle, except losses sustained by Woodrum & Boyles, or in the Woodrum & Boyles pasture. The said Geo. S. Elwood further agrees to give a satisfactory bond in the sum of $15,000, to be approved by said Clay, Robinson & Co., or their attorney or agent, that he will deliver said sheep and horses above mentioned at the time and place designated, and that he will pay said losses sustained on account of the Texas, splenic, or Spanish fever, as above specified, said losses to be paid on or before December 1, 1887. Said Clay, Robinson & Co. agree, when said bond is given and the Rock Hill ranch cattle and the cattle in the Tootle pasture are turned over to them, to deliver to said Elwood $16,000 in the notes of said Elwood & Morehouse, or Elwood, Morehead & Porter, and when said land is delivered said Clay, Robinson & Co. agree to turn over to said Elwood $15,000 more of said notes, and when said Indian Territory cattle are turned over they agree to turn over $10,000 more of said notes, and when said horses and sheep are turned over then the said Clay, Robinson & Co. are

to turn over to said Elwood all notes they or Clay & Forrest hold against him, or of which they, or either of them, are payees, as maker or as one of the makers, except one note of $1,000 given to Clay & Forrest, which is now the property of the Cattle Ranch & Land Co., and release him from all liability to them as indorser or guarantor upon other notes. The said Elwood warrants the title to all of said personal property to be perfect, except liens for expenses of quarantine and liens for damages by reason of said cattle having communicated Texas, Spanish or splenic fever above mentioned, all of which liens are assumed by Clay, Robinson & Co., except as hereinbefore mentioned, and said Clay, Robinson & Co. hereby agree to furnish said Elwood, as fast as he may pay the same out, the sum of $1,650, to be applied in paying the liens against said cattle, occasioned by their having communicated said Texas, Spanish, or splenic fever, which said Elwood has agreed to pay. If said $1,650 more than pay said losses which Elwood is to pay, he is to have the surplus, but if said $1,650 should not be enough to pay said losses he is to pay the balance; said money to be paid to Elwood as fast as he produces satisfactory evidence that he has paid losses. Said Clay, Robinson & Co. also agree to deed to said Elwood E. $\frac{1}{2}$ and S. W. $\frac{1}{4}$ section 31, township 2, range 2, 480 acres; E. $\frac{1}{2}$ and S. W. $\frac{1}{4}$ section 6, township 3, range 2, 480 acres; S. E. $\frac{1}{4}$ section 7, township 3, range 2, 160 acres; S. E. $\frac{1}{4}$ of section 3, township 3, range 2, 160 acres; N. W. $\frac{1}{4}$ section 11, township 3, range 2, 160 acres; subject to all mortgages, incumbrances and liens on the same, none of which are to be paid by said Clay, Robinson & Co. Clay, Robinson & Co. also release a chattel mortgage they now hold on about 300 head of hogs near Haddam. The title to all the land which is to be deeded by Elwood, either directly or through others, to Clay, Robinson & Co. to be perfect, except the incumbrances mentioned herein, and except one 80-acre tract for which said Elwood holds a bond for a deed from Alfred Mitchell, which bond is to be assigned to Clay, Robinson & Co. Said Elwood reserves the posts and wood now cut on the 480-acre tract in township 2, range 1. All the land mentioned herein is in Washington county, Kansas.

"Witness our hands, this 10th day of September, 1887.

GEORGE S. ELWOOD.

CLAY, ROBINSON & CO."

The plaintiff alleged that the Washington National Bank

claimed some interest in the controversy, the nature of which is not fully known. He further stated that the Elwood cattle sold to Clay, Robinson & Co. were in the possession of the sheriff of Washington county, by order of the live-stock sanitary commission, and he asked for a personal judgment against Clay, Robinson & Co. and George S. Elwood for the sum of $4,958, and that the judgment be a first and prior lien upon the herd of cattle sold by Elwood to Clay, Robinson & Co.

Clay, Robinson & Co. answered, first, by a general denial; second, that the plaintiff Woodrum negligently placed his cattle in the pasture with those affected with the fever, and that any loss which he suffered was caused by his own fault and negligence; third, that the contract set up by plaintiff was made with Elwood after they had loaned a large amount of money to him and were having difficulty with him with reference to the collection thereof; that Elwood's financial affairs were in such condition that they were in great danger of losing the money which they had loaned to him, and under these circumstances the contract heretofore set up was made in order to effect a settlement of the indebtedness of Elwood referred to in the contract, and that the property mentioned in the contract was received in payment of this indebtedness; that the contract was entire and indivisible, but that Elwood has only performed in part that which was required of him, and has not delivered the property which was to have been turned over to these defendants, and the failure to deliver the cattle is set forth as a defense to the recovery of a personal judgment by Woodrum against them; fourth, that Woodrum is indebted to them upon a promissory note, given March 4, 1887, for the sum of $8,000, on which note there is still due the defendants from Woodrum the sum of $8,000, with interest from July 11, 1887, at 10 per cent. per annum. It is further stated that the note was secured by a chattel mortgage.

The Washington National Bank answered that it claimed a right to the possession and control over the damages to be

recovered by Woodrum from Clay, Robinson & Co. on the ground that Woodrum had executed a chattel mortgage to them on a part of the stock and cattle set forth and described as damaged by the Elwood herd of cattle; that there was due on the chattel mortgage from Woodrum to the bank the sum of $5,400, with interest thereon. It is further alleged that the security of the bank upon the cattle so mortgaged was impaired by the death and sickness resulting from the Texas fever to the extent of $2,954, and that Woodrum, who had mortgaged the cattle, is insolvent, and that the bank was compelled to look to the security upon the cattle only for the payment of its debt. It prayed that $2,954 of the judgment which Woodrum might recover from Clay, Robinson & Co. should be turned over and paid to the bank to apply on the indebtedness due from Woodrum to the bank.

Elwood filed a general denial; and further answering, said that he admitted that he had driven the diseased cattle into the country, but denied that he knew that they were affected with the fever. He also admitted entering into the contract with Clay, Robinson & Co., and alleged that he had fulfilled his part of the contract, except as to turning over a portion of the cattle mentioned, and that he was prevented from doing that by the refusal of Clay, Robinson & Co. to accept the same. Elwood further answered that the plaintiff Woodrum knew of his contract with Clay, Robinson & Co., and agreed to look to them alone for any damages which he sustained, and that he released him from any claim for the same.

A trial was had with a jury, which resulted in a judgment in favor of Woodrum and against Clay, Robinson & Co. in the sum of $4,836.88; and it was adjudged that the Washington National Bank should be subrogated to the rights of Woodrum under the judgment to the extent of $2,359.10.

Clay, Robinson & Co. allege error in the proceedings, and ask a reversal of this judgment.

*A. S. Wilson*, for plaintiffs in error.

*Joseph G. Lowe, Chas. Smith, J. W. Rector*, and *Omar Powell*, for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: The action of Woodrum is based on the contract made between Elwood and Clay, Robinson & Co., which has been set out at length in the statement of the case. It appears that in the spring of 1887, Elwood drove a herd of southern cattle into Washington county, which had been brought from the prohibited district south of Kansas, and were liable to, and did, impart to native cattle a disease known as Texas, splenic, or Spanish fever. At that time, Woodrum was the owner of a herd of native steers, and was keeping them in Washington county. About July 4, 1887, they became diseased, and it is stated that 167 of them sickened and died from the Texas fever. Clay, Robinson & Co. are live-stock dealers, with headquarters in Chicago and Omaha, who furnished money to stock-growers and feeders in the west, taking security on their cattle, it being a part of the arrangement that when the cattle were ready for the market they should be shipped to and sold by Clay, Robinson & Co., whose compensation was the interest on the money furnished, and the commission obtained for selling the cattle. Prior to that time, they had furnished Woodrum quite a sum of money, and in 1887 he was owing them about $8,000. They also had similar relations with Elwood, who was indebted to them in a large sum of money at the same time. The herd of cattle driven into the State by Elwood in 1887 seems to have communicated the Texas fever to several herds of cattle in that section of the State, and heavy claims for damages were made against Elwood for loss and damages resulting from that cause. It is alleged that he was financially embarrassed, and Clay, Robinson & Co., to protect themselves, as they aver, entered into the contract above mentioned. This contract, as will be seen, provides that land and personal property belonging to Elwood should be conveyed and sold to Clay, Robinson & Co., in consideration of which certain acts were to be done by them, certain payments made and notes surrendered, and certain obligations assumed. Among

other things, and as a part of the consideration for the sale and conveyance of the property, they were to assume the payment of the claim and lien for damages to the Woodrum cattle by reason of the fever having been communicated to them by the Elwood cattle. Woodrum claimed that he sustained damages on account of the Texas fever to the extent of $4,958, and he brought this action on that provision of the contract wherein Clay, Robinson & Co. assumed the payment of such damages, and asked a personal judgment against them for that sum. He also asked that it might be declared a lien against the Elwood herd of cattle, but this claim appears to have been abandoned on the trial, and only a personal judgment was sought for or obtained. In the course of the trial, Clay, Robinson & Co. offered testimony tending to establish the defense which they set forth, namely: That Elwood had failed to comply with the terms of the contract, in that he was required to deliver 1,320 head of cattle, but that he fell short of what was required of him, and delivered only 1,105 head. The court excluded this and all testimony tending to show a failure of consideration or a non-compliance by Elwood with the provisions of the contract on his part; and this is one of the principal objections urged by plaintiffs in error.

This ruling was prejudicially erroneous. The defense was proper, and properly pleaded. Woodrum relied on the contract alone, and whatever right he had to a personal judgment against Clay, Robinson & Co. was derived through this contract, to which he was not a party. Unless he has released Elwood, he has a right of action against him for the damages sustained, and it was competent for him to bring this action against Clay, Robinson & Co. It is well settled in this state, that where one person agrees with another to do some act for the benefit of a third person, such third person, though not a party to the promise, may maintain an action against the first party for a breach of the agreement. (*Manufacturing Co. v. Burrows,* 40 Kas. 361; *Mumper v. Kelley,* 43 id. 256.) The

1. Contract—action by third party — equities—failure of consideration; good defense. third party, however, who avails himself of such a contract, and claims under its provisions, is subject to the defenses arising out of the contract between the original parties. The contract in this case, as we construe it, is executory, and is entire and indivisible. Its provisions appear to have been dependent on each other, and mutually binding on each of the parties. Elwood agreed to convey numerous tracts of land, and to sell and turn over horses, cattle and sheep, and in consideration of which Clay, Robinson & Co. agreed to assume and pay certain liens and obligations against Elwood, furnish a certain sum of money for payment of other claims, deliver certain promissory notes of Elwood and others, release a lien which they had on a bunch of hogs, and were to allow Elwood to retain certain posts and wood on the land which he agreed to convey. There were incumbrances and liens on a great deal of the real and personal property mentioned, some of which were assumed by Clay, Robinson & Co., and others which they did not assume, but expressly stipulated that they should be satisfied and discharged by Elwood. It is true that certain acts were to be performed at certain times, when the other party was required to do certain things on his part, but no one of these provisions appears to be distinct and independent of the others. It appears to us to have been intended as a complete settlement between the parties, and we cannot say that Clay, Robinson & Co. would have purchased any part of the stock and assumed the obligations which they did unless all were delivered as promised, or that the parties understood that the delivery of certain notes or the doing of certain things was to be full compensation for any part of the cattle which were the subject of contract. While certain notes were to be surrendered when certain property was to be delivered, it cannot be said that each constitutes a distinct and severable item which is independent of the other conditions of the contract. The liens or damages assumed by

Clay, Robinson & Co. cannot be apportioned to any particular part of the cattle agreed to be delivered. Elwood agreed to sell and turn over 1,320 head of cattle, whereas it is claimed that 215 of that number were never delivered. Would Clay, Robinson & Co. have assumed an obligation to the extent of $4,958 upon a promise to deliver a part of the 1,320 head? Would they be liable on this provision of the contract if none of the property had been conveyed or delivered? Woodrum is claiming the benefit of a promise made to Elwood which was based on conditions to be performed by Elwood, and how can he recover unless those conditions have been performed? He is in no better position to enforce the contract derived through the promise to Elwood than Elwood himself would be.

In *Benedict v. Hunt*, 32 Iowa, 27, an action was brought by a mortgagee against a purchaser of mortgaged premises who had assumed the payment of the mortgage, and it was held that it was a good defense that the grantor of the defendant had no title to the property, and that the consideration wholly failed. And it is also stated that the party for whose benefit the promise is made cannot claim to occupy any better position than the party who made the contract. The New York court of appeals, in a case where a party for whose benefit a promise was made was seeking to enforce it against the promisor, held that a failure of consideration was a good defense, and stated that "there is no justice in holding that an action on such a promise is not subject to the equities between the original parties springing out of the transaction or contract between them. It may be true that the promise cannot be released or discharged by the promisee, after the rights of the party for whose benefit it is said to have been made have attached, but it would be contrary to justice and good sense to hold that one who comes in by what Judge Allen, in *Vrooman v. Turner*, [69 N. Y. 280,] calls 'the privity of substitution,' should acquire a better right against the promisor than the promisee himself had." (*Dunning v. Leavitt*, 85 N.Y. 30. See also, *Flagg v. Munger*, 9 N. Y. 483.)

We do not decide that the testimony which was rejected was sufficient to show a failure of consideration, but simply that such failure is a proper defense in the action, and that the testimony offered was competent and material to establish that defense, and should have been received.

Another point only of those presented requires attention. Clay, Robinson & Co. alleged that Woodrum was indebted to them in the sum of $8,000, upon a promissory note executed March 4, 1887, and which has been heretofore mentioned; and they ask that the same should be set off against any claim for a personal judgment that might be made against them under their contract. The court found that there was due to them from Woodrum upon this note, on September 10, 1887, which was the date of the contract between Clay, Robinson & Co. and Elwood, the sum of $7,923.26, no part of which has been paid, and, with accrued interest thereon, there was due at the time of the trial the sum of $8,535, which draws interest at the rate of 10 per cent. We think the note and claim thereon was a proper subject of set-off in this proceeding as it was tried. Only a personal judgment was rendered in the action. Woodrum sought a recovery under the contract of Clay, Robinson & Co. When the contract was made, he was indebted to them in a greater amount than was found to be due from them under their contract. They may have contracted with reference to this indebtedness, and assumed the obligation to Woodrum in the expectation that whatever their liability under the contract might be, it would be set off against his indebtedness to them. There were cross-demands between the parties which in equity and under the statute should be set off against each other, and neither party can deprive the other of the benefits thereof by assignment, "but the two demands shall be deemed to be compensated so far as they equal each other." (Civil Code, § 100. See, also, §§ 27, 94, 98. *Sponenbarger v. Lemert*, 23 Kas. 55; *Gardner v. Risher*, 35 id. 93; Story, Eq., ch. 38.)

2. Set-off.

We have treated the case as the parties thereto appear to have treated it, as an action upon contract for the recovery of

money, in which only a personal judgment against Clay, Robinson & Co. was given.   We determine nothing as to what the rights of the parties may be under the liens mentioned in the pleadings.

The plaintiffs in error insist that the Washington National Bank should have been dismissed from the case; but we think that under the pleadings it was entitled to be heard and have its rights determined.   Its rights, however, depend on the course of the next trial, the relief sought, and the testimony then offered; and hence, we refrain from expressing any opinion as to its rights under the evidence given at the last trial.

The errors mentioned will require a reversal of the judgment and a new trial, and it is therefore unnecessary to notice the objections with reference to the jury and the findings which they returned.

The judgment will be reversed and a new trial granted.

All the Justices concurring.